FILED

2015 Feb-04  AM 11:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHANDRIKA ANDERSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:12-cv-03537-RDP** |
| | } | |
| **BELLSOUTH** | } | |
| **TELECOMMUNICATIONS,  LLC  (d/b/a** | } | |
| **AT&T Southeast),** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant's Motion for Summary Judgment (Doc. 20) filed on March 27, 2014.  The Motion has been fully briefed and is now ripe for review.  (Docs. 22, 24).

Plaintiff Shandrika Anderson alleges Defendant Bellsouth Telecommunications, LLC discriminated against Plaintiff in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*  More specifically, Plaintiff[1] asserts claims under the ADA for: (1) unlawful discrimination for failure to accommodate her disabilities (Count One); (2) discriminatory termination (Count One); and (3) retaliation (Count Two).  (*See* Doc. 1).  Plaintiff also asserts claims under the FMLA for interference (Count Three) and retaliation (Count Four).

After carefully reviewing the Rule 56 record and considering the arguments made by the parties, the court concludes that Defendant is entitled to summary judgment on all of Plaintiff's

---

[1] At various times during this case, Plaintiff has appeared *pro se*; however, Plaintiff is represented by counsel for the purposes of this Motion (Doc. 20).

claims.  Therefore, Defendant's Motion (Doc. 20) is due to be granted, and accordingly, all of Plaintiff's claims are due to be dismissed with prejudice.

## I.     Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## II.     Facts[2]

### A.     Background

BellSouth hired Plaintiff Shandrika Anderson in January 2008. (*See* Doc. 20, Ex. A, Pl. Dep. 31:16-20).  Plaintiff was asked to resign her employment from BellSouth on March 28, 2012; she complied on that date.  (*Id.* at 81:9-21; Ex. 15 to Pl. Dep.).

While employed, Plaintiff worked as a Sales Associate in a Consumer Services Call Center ("Call Center") in Birmingham, Alabama. (Pl. Dep. 31:21-32:4-33, 67:14-68:6).  A Sales Associate's duties are performed in an office environment where employees are assigned to individual workstations with a desktop computer and a telephone.  (*Id.* at 32:5-12).  The job requires handling incoming customer calls and selling Defendant's products and services over the telephone.  (*Id.* at 32:13-17).  Sales Associates are required to meet a monthly and annual sales quota, referred to as a sales "objective." (*See id.* at 32:18-22).  The sales objective is the same for all Sales Associates in the call center.  (*Id.* at 32:23-33:1).

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Furthermore, Appendix II to the court's Initial Order (Doc. 8) sets forth the court's Summary Judgment Requirements.  Appendix II specifically notes that "briefs and evidentiary materials that do not conform to the following requirements may be stricken." (Doc. 8 at 17).  Appendix II requires that all "briefs . . . begin with a statement of allegedly undisputed relevant material facts set out in separately numbered paragraphs. Counsel must state facts in clear, unambiguous, simple, declarative sentences. *All statements of fact must be supported by specific reference to evidentiary submissions.*" (Doc. 8 at 12) (emphasis added). Appendix II requires that in responsive briefs, "[t]he first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in separately numbered paragraphs that coincide with those of the moving party's claimed undisputed facts. *Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.* **All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment**." (Doc. 8 at 13) (certain emphasis added).  Plaintiff's response to Defendant's Motion (Doc. 49) fails to dispute Defendant's statement of facts, and is almost entirely devoid of record citations. (Doc. 53).  Therefore, nearly all of Defendant's Statements of Fact are deemed admitted, except for those directly contradicted by Plaintiff's citations to the evidentiary record .

When Defendant hired Plaintiff, it provided her with several weeks of initial classroom training and on-the-job training that covered all aspects and requirements of the Sales Associate job. (*Id.* at 33:22-34:3, 39:18-40:25). Throughout Plaintiff's employment, she also received ongoing training and coaching. (*Id.* at 40:5-41:18). A Sales Associate's position is a non-management job that is within the bargaining unit represented by the Communications Workers of America ("CWA"). (*Id.* at 33:6-18). At all pertinent times, the terms and conditions of Plaintiff's employment were governed by the collective bargaining agreement between BellSouth and CWA (the "Labor Agreement"). (*Id.* at 33:12-15).

**B.      Defendant's Management Structure**

The immediate three levels of supervision above a Sales Associate position in the Call Center include an immediate supervisor (also known as a Sales Coach), a second-level manager that holds the title of Center Sales Manager (also sometimes called a Center Director), and a third-level manager who held the title of General Manager. (*Id.* at 34:4-24). Plaintiff does not recall the person who worked as her General Manager at any time during her employment with Defendant, and (therefore, not surprisingly) does not contend that any of her General Managers discriminated against her in any way, including discrimination based on her disability or use of FMLA leave. (*Id.* at 38:16-23). Nor does Plaintiff know who any of her General Managers reported to, and she does not contend that any manager above her General Manager discriminated against her in any way. (*Id.* at 39:10-17, 46:8-47:1). Plaintiff had no interaction with any manager above her Center Sales Manager (*i.e.*, her second-level supervisor). (*Id.*).

From January 2008 to March 2011, Plaintiff's Center Sales Manager (her second-level supervisor) was Steve Wadley. (*Id.* at 43:13-23). Plaintiff does not contend that Wadley discriminated against her in any way. (*Id.* at 43:19-22, 46:12-16). Beginning on April 1, 2011,

and continuing through the date of her resignation (March 28, 2012), Anastacia ("Stacy") Hardy replaced Wadley and became Plaintiff's second-level supervisor. (*See id.* 45:24-46:11; Ex. 15 to Pl. Dep.).  Although Plaintiff does not contend that Hardy held her to a higher standard than other Sales Associates (*id.* at 123:4-7), she does allege that Hardy mistreated her.  (*Id.* at 158:17-20).[3]

### C.      Bellsouth's Disability Claim Structure

During Plaintiff's employment, Plaintiff applied for and was granted leave under the BellSouth Short Term Disability ("STD") benefits plan. (Pl. Dep. 42:6-23, 44:14-45:4).  The exact nature of Plaintiff's leave is not completely clear from the record.

Defendant outsources the management of its disability claims process to an independent third-party claims administrator, Sedgwick Claims Management Services ("Sedgwick"). Sedgwick is responsible for processing and resolving all of Defendant's employees' STD claims. (*See* Pl. Dep. 44:24-45:23).  Plaintiff interacted with Sedgwick directly through the AT&T Integrated Disability Service Center (the "Disability Center") and her disability case manager. No person within Plaintiff's direct chain of command made any decision regarding any of Plaintiff's FMLA leave applications. (Pl. Dep. 148:5-149:21).  That responsibility belonged to the Disability Center. (*Id.* at 44:24-45:23, 148:21-149:21). Plaintiff does not contend that any claims representative discriminated against her in any way. (*Id.* at 149:16-21).

### D.      Plaintiff's First FMLA Leave (March 28 to March 30, 2011)

Plaintiff applied for and was granted FMLA leave twice in March 2011.  (*See* Pl. Ex. H-8, FMLA Eligibility Forms, at 1459, 1461, 1465; Pl. Dep. 44:14-20).  On the first such occasion, March 28, 2011, Plaintiff received fifteen hours of FMLA leave and returned to work on March

---

[3] Plaintiff does not contend that any of Defendant's other managers discriminated against her based on her disability.  (*Id.* at 46:12-47:1).

30. (Pl. Ex. H-8, FMLA Eligibility Form, at 1459, 1461).[4]  At that time, the undisputed Rule 56 evidence shows that Defendant found Plaintiff eligible to receive FMLA benefits, having worked for Defendant for at least twelve months and also having worked 1,250 hours during the preceding twelve months prior to the first date of her absence.  (*See id.*).

### E.    Plaintiff's Second FMLA Leave (March 31 to September 2)

On March 31, 2011 Plaintiff left work due to a "high level of stress," and shortly thereafter, Plaintiff's doctors diagnosed her with bi-polar disorder, post-traumatic stress disorder, depression, and anxiety.  (Pl. Dep. 18:1-11, 42:6-43:1; Pl. Ex. C-3, Tieszen Recommendation, July 26, 2011, at 793).  Plaintiff was out on STD leave until September 2011.  (Pl. Dep. 42:6-23).  Plaintiff was found eligible to receive FMLA benefits again.  (Pl. Ex. H-8, FMLA Eligibility Form, at 1465).

On May 16, 2011, Plaintiff received a letter from the Disability Center advising Plaintiff that her medical information did not support disability from any type of work, including modified duties. (Pl. Ex. C-3, Disability Center Letter, May 16, 2011, at 699).  Furthermore, the letter informed Plaintiff that, as of May 19, continued benefit payments would only be paid contingent on the results of an independent medical evaluation.  (*Id.*).  The record indicates Plaintiff was able to extend the benefits through June 15 without an independent medical evaluation due to a hospitalization for severe depression.  (Pl. Ex. A-1, STD Admin. Record, at 565).  Ultimately, the Disability Center denied an extension of Plaintiff's STD benefits beyond June 19, 2011.  Plaintiff challenged this denial and remained on STD leave.  On July 26, 2011, Dr. Stuart Tieszen sent the Disability Center a letter indicating that Plaintiff was unable to return

---

[4] For clarity, the court references the evidentiary record with citations that maintain the original pagination of the documents cited therein.

to work and she would need to be reassessed in six weeks.   (Pl. Ex. C-3, Tieszen Recommendation, July 26, 2011, at 793).

On September 1, 2011, the Disability Center sent Plaintiff a letter confirming this denial of benefits, finding: "There was insufficient information to support your inability to work. Although some findings are referenced, none are documented to be so severe as to prevent you from performing any type of work from June 19, 2011 through your return to work."  (Pl. Ex. A-1, STD Admin. Record, at 588-91).[5]  It is undisputed that Plaintiff attempted to remain on STD leave for about six months, from the end of March to the beginning of September.  (Pl. Dep. 42:18-23).

F.    **Plaintiff's Return to Work (September 2 to September 14)**

After the denial of her STD claims, Plaintiff returned to work on September 2, 2011.  (*Id.* at 150:4-25; *see also id.* at 170:1-14 (noting that when Plaintiff's STD benefits were denied she felt she was being "pressur[ed] to come back to work" which made her feel like she was "going to lose her job.")).

On September 14, 2011, Plaintiff left work, claiming to have suffered a relapse.  (Pl. Ex. D-4, STD Admin. Record, at 875-83).  This episode led to Plaintiff's hospitalization.  (*See* Pl. Ex. F-6, Crawford Assessment, Sept. 16, 2011, at 939-41).  One of Defendant's managers, Michael LeBlanc, found Plaintiff eligible to receive her remaining fifteen hours of leave under the FMLA.  (Pl. Ex. H-8, FMLA Eligibility Form, Sept. 14, 2011, at 1467).  In particular, LeBlanc acknowledged that although Plaintiff had not worked 1,250 hours during the past twelve

---

[5] Plaintiff received a letter from the Disability Center's Quality Review Unit upholding the denial of STD benefits by the Disability Center from June 19, 2011 through September 6, 2011, on the same grounds.  (Pl. Ex. H-8, Disability Center Letter, Nov. 30, 2011, at 869).

months, Plaintiff had qualified and been approved to receive FMLA benefits for the same medical condition within the same calendar year.  (*Id.* at 1467-68).

### G.        Request for Change in Duty Station

Plaintiff alleges that sometime in 2011, she requested to be moved from Birmingham Call Center 1 to Birmingham Call Center 2 because she felt the music playing in Birmingham Call Center 1 was too loud for her to concentrate. (Pl. Dep. 157:15-158:16).  However, Plaintiff never filed a formal request or complaint requesting such an accommodation.  In a letter to the EEOC, Defendant indicates Plaintiff requested a transfer, on September 13, 2011, the day before she relapsed.  (Pl. Ex. MISC-9, Def. Resp. Letter to EEOC, Feb. 29, 2012, at 1402).

Instead of moving locations, Plaintiff returned to work and Defendant turned down the music in Birmingham Call Center 1 so that Plaintiff no longer believed it to be too loud.  (*Id.* at 164:7-20).  Plaintiff did not request any further accommodation. (Pl. Dep. 157:7-10).

### H.        Plaintiff's Leave After Relapse (September 14 to November 6)

After her relapse, Plaintiff remained on leave through at least November 6, 2011.  (*See* Pl. Ex. D-4, STD Admin. Record, at 892).  At least initially, Plaintiff was expected to return to work by October 10, unless her STD benefits were extended.  (*Id.* at 885-86).  For that reason, on October 10, Plaintiff received a letter from the Disability Center, advising Plaintiff that her medical information did not support disability from any type of work, including modified duties. (Pl. Ex. C-3, Disability Center Letter, Oct. 10, 2011, at 850).  Furthermore, the letter informed Plaintiff that, as of October 13, Plaintiff's continued benefits payments would be paid contingent on the results of an independent medical evaluation (*id.*), and Plaintiff was granted an extension of benefits so that an independent medical evaluation could be conducted by Dr. Thomas Boll (Pl. Ex. D-4, STD Admin. Record, at 886, 888).

On October 27, Dr. Boll conducted an independent medical evaluation of Plaintiff.  (*Id.* at 890; Pl. Ex. H-8, Boll Assessment, Oct. 27, 2011, at 982-85).   In his evaluation, Dr. Boll recounted the prior diagnoses by Dr. Tieszen and suggested she was suffering from various "Mood Disorders."   (*Id.* at 984).   Dr. Boll recommended that Plaintiff receive certain accommodations, including a modified work schedule and a change to a less disruptive setting in order to reduce her stress.  (*Id.*).   Dr. Boll's report disagreed with Dr. Tieszen's recommendation that Plaintiff return to work within the week, but Dr. Boll accepted that Plaintiff could return by November 1.  (*Id.* at 984-85).   Ultimately, Plaintiff returned to work on November 7.  (Pl. Ex. D-4, STD Admin. Record, at 893).

## I.   Plaintiff's Return to Work After Relapse (November 7 to November 16)

When Plaintiff initially returned to work, she worked six hours a day from November 7 to November 11.  (*Id.* at 898).  On or around November 11, Plaintiff sought and was denied FMLA leave.  (Pl. Ex. H-8, FMLA Eligibility Form, Nov. 11, 2011, at 1473).  Although Defendant found Plaintiff still had fifteen hours of time off remaining under the FMLA, Defendant found Plaintiff was no longer eligible to take leave.  (*Id.*).  Defendant determined Plaintiff had not worked 1,250 hours during the preceding twelve months and did not qualify or receive FMLA approval for the same medical condition within the same calendar year.[6]  (*Id.*).  It is undisputed that Plaintiff worked 728.87 hours between November 11, 2010 and November 11, 2011.  (Pl. Dep. 129:4-14; Ex. 17 to Pl. Dep., at 2).

---

[6] As Plaintiff notes, Defendant's FMLA Eligibility Forms indicates:

Once the employee meets these two eligibility criteria (referring to the 12 months of work criteria and the 1,250 hours criteria) and takes leave for a qualifying event, and get FMLA Approved, the employee does not have to re-qualify, in terms of the number of hours worked, in order to take an additional leave for the same qualifying event during the same calendar year.

(Doc. 22 at 7-8 (quoting Pl. Ex. H-8, FMLA Eligibility Forms)).

Nevertheless, on November 10, 2011, Dr. Tieszen submitted a recommendation that Plaintiff continue to work "half days for the time being." (Pl. Ex. F-6, Tieszen Recommendation, Nov. 10, 2011). Soon thereafter, Plaintiff was formally granted a reduction in hours (*i.e.*, a "modified tour" or "restricted hours") from November 11 to November 14. (*See* Ex. 21 to Pl. Dep., Restricted Duty Notice).

On November 15, Plaintiff contends Hardy called Plaintiff's disability case manager in order to void Plaintiff's accommodations. (Doc. 22 at 6; *see also* Pl. Ex. D-4, STD Admin. Record, at 899-902). Indeed, call logs indicate that Hardy made inquiry regarding the status of Plaintiff's leave request. (Pl. Ex. D-4, STD Admin. Record, at 899). Hardy's call was transferred to Plaintiff's case manager; following that call a voicemail was left with Plaintiff indicating that her "mod tour is voided." (*Id.*). Although it is unclear what hours Plaintiff actually worked between November 11 and November 18, entries in the Disability Center suggest that she worked the following schedule:

> 11/11/11–ill from 7:30 AM to 8:30 AM then worked "remainder of the day"[7]
> 11/14/11–worked full day[8]
> 11/15/11–worked full day except for vacation 3PM - 4PM
> 11/16/11–worked full day

(Pl. Ex. D-4, STD Admin. Record, at 902).[9] Furthermore, Plaintiff was disciplined by Defendant for attendance on November 11 (presumably, for arriving an hour late at 8:30 a.m. as indicated above). (*See* Ex. 13 to Pl. Dep.).

---

[7] According to Plaintiff's Exhibit D, Hardy seems to have confirmed that Plaintiff worked a "full duty" on this day. (Pl. Ex. D-4, STD Admin. Record, at 899).

[8] Plaintiff never indicates whether she meant she worked a full normal workday or a full half workday. The court assumes this means she worked without a reduction in hours.

[9] Defendant provides evidence showing Plaintiff was granted a restricted work schedule from November 11 to November 13, but she was required to return to full time on November 14. (Ex. 21 to Pl. Dep., Restricted Duty Notice).

In a letter to the EEOC, Defendant explained its decision to remove Plaintiff from a modified work schedule.  (Pl. Ex. MISC-9, Def. Resp. Letter to EEOC, Feb. 29, 2012, at 1403). It contends that, upon returning to work in November, Plaintiff's request for a modified work schedule was not supported by any documentation.  (*Id.*).   In particular, Defendant states "[Plaintiff's] request could not be accommodated until additional information could be obtained from [its] Integrated Disability Center who processes all requests for workplace restrictions." (*Id.*).    Therefore, once Plaintiff and her doctors provided Defendant with the required documentation, her requests for a modified work schedule were immediately honored.  (*Id.*).

**J.      Plaintiff's Modified Tour (November 21 to December 5)**

On Friday, November 18, 2011, Dr. Tieszen provided Defendant with his recommendation that Plaintiff work "half days for two weeks."   (Pl. Ex. F-6, Tieszen Recommendation, Nov. 18, 2011).  Plaintiff was subsequently granted restricted work hours from Monday, November 21, 2011 to December 4, 2011.  (Ex. 20 to Pl. Dep., Restricted Duty Notice).  On November 21, Plaintiff also initiated an EEOC charge of discrimination against Defendant.  (Doc. 22 at 14).   After November 21, it is undisputed that Plaintiff was not disciplined or penalized for working reduced hours.  (Pl. Dep. 150:4-154:23).

In addition to reducing Plaintiff's hours, Defendant did not require Plaintiff to meet a sales objective for September, October, or November of 2011.  (*Id.* at 95:4-96:7, 98:12-100:6, 151:1-152:22).  Defendant contends that this "ramp-up" time was a courtesy and that Plaintiff neither requested the time nor was Defendant required to provide it.  (*Id.* at 100:9-19).  Plaintiff argues that this courtesy was irrelevant because she "was still very sick and in and out of the hospital most of the time . . . [without] access to her computer."  (Doc. 22 at 14).

On November 30, Dr. Tieszen provided Defendant with his amended recommendation that Plaintiff return to work "full time with no restrictions effective December 5, 2011." (Pl. Ex. F-6, Tieszen Recommendation, Nov. 30, 2011; Pl. Dep. 155:5-25; Ex. 22 to Pl. Dep.).

### K.    Plaintiff's Return to Full Duty (December 5, 2011 to March 28, 2012)

In contrast to the events which took place between March and November 2011, and with one exception,[10] Plaintiff's return to work was relatively uneventful. By all accounts, Plaintiff returned to full duty on December 5, 2011, and worked without any major restrictions until her resignation on March 28, 2012.

### L.    Bellsouth's Complaint Procedure

At all times while employed by Defendant, Plaintiff concedes she was familiar with Defendant's policies prohibiting discrimination in the workplace based on both disability and FMLA usage. (Pl. Dep. 47:8-48:20). Plaintiff also had knowledge of the various ways she could lodge a complaint with BellSouth to report any conduct or action that she viewed as discriminatory or harassing. (*Id.* at 48:21-49:10).

Prior to filing the Complaint initiating this case, Plaintiff never lodged any internal or external complaint of disability discrimination or harassment, nor did she complain of any FMLA interference or retaliation. (Pl. Dep. 181:7-183:25). Plaintiff never filed a grievance with CWA alleging harassment or interference under the FMLA, nor did she file a grievance alleging any mistreatment by a Bellsouth manager based on disability. (*Id.* at 31:5-15).

None of the STD denial letters came from Hardy, and Hardy did not participate in any decision about STD benefits regarding Plaintiff. (*Id.* at 170:8-14, 194:2-5). The undisputed Rule 56 evidence shows that all such decisions were made by persons at Sedgwick. (*Id.* at 44:24-45:8,

---

[10] That exception is that in January, Plaintiff broke her ankle and requested Defendant provide her a wheelchair as an accommodation. (Pl. Dep. 156:21-157:1). Defendant provided Plaintiff a wheelchair. (*Id.*).

168:4-9).  Plaintiff does not contend that anyone at Sedgwick discriminated against her under the
ADA or FMLA.  (*Id.* at 149:1-21).

### M.    Bellsouth's Disciplinary Process

Pursuant to its Labor Agreement with the CWA, Defendant Bellsouth utilized a
progressive discipline process whereby employees are given several chances to correct problems
such as unsatisfactory performance or attendance. (*Id.* at 62:4-18).  As part of this process, an
employee is guided through a four-step sequence in which formal written discipline is
implemented.  (*Id.*).  The first step involves written counseling.  (*Id.*).  If necessary (*i.e.*, if
performance or attendance continues to be a problem), the next step involves a written warning.
(*Id.*).  The third step calls for either a traditional suspension without pay or a "Letter in Lieu of
Suspension" which is designed to carry the force and effect of a traditional suspension without
depriving the employee of pay. (*Id.*).  The final step involves termination of the individual's
employment.  (*Id.*).  Defendant's employees receive information about this discipline process,
and it is explained when formal discipline is administered that future violations may lead to the
next step of discipline. (*Id.* at 62:4-18, 70:4-9).

### N.    Plaintiff's Formal Disciplinary Record

During Plaintiff's employment with Defendant, she received numerous disciplinary
reprimands, including the following formal discipline:

*For Unsatisfactory Performance*
    Counseling, June 7, 2010 (Pl. Dep. 57:11-58:2; Ex. 6 to Pl. Dep.);
    Warning, July 7, 2010 (Pl. Dep. 61:2-25; Ex. 7 to Pl. Dep.);
    Letter in Lieu of Suspension, Nov. 9, 2010 (Pl. Dep. 62:23-63:9; Ex.8 to Pl. Dep.); and
    2d Letter in Lieu of Suspension, Feb. 3, 2011 (Pl. Dep. 72:17-73:14; Ex. 11 to Pl. Dep.).

*For Unsatisfactory Attendance*
    Counseling, Sept. 11, 2009 (Pl. Dep. 53:15-54:2; Ex. 2 to Pl. Dep.);
    Counseling, Sept. 8, 2011 (Pl. Dep. 77:23-78:10; Ex. 12 to Pl. Dep.);
    Warning, Nov. 11, 2011 (Pl. Dep. 79:8-24; Ex. 13 to Pl. Dep.); and
    Letter in Lieu of Suspension, Feb. 15, 2012 (Pl. Dep. 79:25-81:9; Ex. 14 to Pl. Dep.).

*For Misconduct*
    Counseling, Apr. 2, 2010 for overtime not worked (Pl. Dep. 56:5-24; Ex. 4 to Pl. Dep.);
    Warning, Dec. 8, 2010, failure to follow policy (Pl. Dep. 70:10-71:6; Ex. 9 to Pl. Dep.); and
    Letter in Lieu of Suspension, Jan. 25, 2011 (Pl. Dep. 71:7-72:1; Ex. 10 to Pl. Dep.).

As of February 15, 2012, Plaintiff was at the third step of discipline (*i.e.*, Letters in Lieu of Suspension) for both unsatisfactory sales performance and unsatisfactory attendance. (Pl. Dep. 87:14-25, 92:23-93:19; Exs. 11, 14 to Pl. Dep.).   Plaintiff understood that the next step of discipline under the progressive discipline policy was termination. (Pl. Dep. 87:14-25, 92:23-93:19).

The Rule 56 record contains undisputed evidence showing that Plaintiff's sales performance was less than satisfactory on an ongoing basis. (*See id.* at 124:12-125:18 (acknowledging that she and her CWA representative, Ronald Reese, both recognized that she had "serious performance issues")).   In fact, Plaintiff's sales performance was unsatisfactory from December 2011 through the day she resigned which was March 28, 2012.  (*Id.* at 102:6-103:24, 105:9-20; Ex. 15 to Pl. Dep.).   It is undisputed that Plaintiff's problems with unsatisfactory sales performance started ***before*** Hardy became her second-level manager.  (*Id.* at 156:5-10).

### O.    Resignation in Lieu of Termination (March 28, 2012)

As of March 28, 2012, Plaintiff's sales numbers for the month were not on track to meet her sales objective.  (*Id.* at 105:9-20).   At that time, Center Manager Hardy held a meeting with Plaintiff to inform her that because she was unlikely to meet her sales objective for March (four months in a row) her employment would most likely be terminated at the beginning of April 2012.  (*Id.* at 85:1-88:15, 91:19-94:25, 105:9-106:6, 109:15-118:14).   Hardy informed Plaintiff at the March 28, 2012 meeting that Plaintiff had two options: (1) wait until after April 1, 2012 and see what the final sales numbers were for March and then be involuntarily terminated if she did

not meet the March sales objective; or (2) voluntarily resign prior to April 1, 2012 and receive termination pay pursuant to the Labor Agreement. (*Id.* at 93:1-94:25, 105:9-106:6, 109:15-118:14).

During the March 28, 2012 meeting, Plaintiff prepared and submitted a resignation letter stating "[p]lease except [sic] my resignation due to performance problems." (*Id.* at 81:9-24, 112:14-24; Ex. 15 to Pl. Dep.).   After submitting that resignation letter, Plaintiff received severance pay (also known as termination pay) pursuant to the Labor Agreement.  (*Id.* at 116:18-118:8).   Hardy was not obligated to give Plaintiff the option of resigning and receiving termination pay in connection with her resignation.  (*Id.* at 109:7-111:2).   Hardy could have waited for the March 2012 final sales numbers and then terminated Plaintiff for continued unsatisfactory performance. (*Id.*). If Hardy had opted to terminate Plaintiff for unsatisfactory performance, Plaintiff's personnel record presently would reflect "involuntary termination" not "resignation," and Plaintiff would not have received termination pay pursuant to the Labor Agreement. (*Id.* at 109:7-111:2, 118:1-8).   Plaintiff admits that she does not know of any of Defendant's employees who were treated more favorably by management than she was.  (*Id.* at 156:11-20).

## III.   Discussion

After careful review of Defendant's Motion for Summary Judgment (Doc. 20), along with the briefs and submissions filed in connection with it, and for the reasons outlined in this opinion, the court concludes that there are no material issues of fact in this case and that Defendant is entitled to summary judgment on all of Plaintiff's ADA and FMLA claims as a matter of law.  Each of Plaintiff's claims is addressed below.

### A.    ADA Discrimination Claims

Based on the Rule 56 record, Defendant is entitled to summary judgment on both of Plaintiff's ADA discrimination claims.  Liberally construed, Plaintiff's Complaint asserts two claims of unlawful discrimination under the ADA.  She claims that Defendant:  (1) failed to provide her with a reasonable accommodation in violation of the ADA; and (2) terminated her employment because of her disability in violation of the ADA.  (Doc. 1, Compl., at 3-4).

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* at § 12111(8).  And, discrimination may include the failure to make reasonable accommodations, or termination.  *Id.* at § 12112(b).

A plaintiff may establish a *prima facie* case of discrimination in two ways: (1) presenting direct evidence of discriminatory intent, or (2) meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  Because Plaintiff has not offered the court any legitimate direct evidence of discrimination,[11] Plaintiff's claims are to be evaluated under the familiar *McDonnell Douglas* framework for proving discrimination through circumstantial evidence.  *See id.*

---

[11] Plaintiff purports to offer two pieces of "direct" evidence: (1) Defendant's letter to the EEOC recounting Hardy's experience with Plaintiff (Pl. Ex. F-6, Bellsouth Letter, May 22, 2012), and (2) Hardy's "documented harassment" of Plaintiff (Pl. Ex. D-4, STD Admin. Record, at 899-900).  Although circumstantial evidence is evidence that only suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence, direct evidence is evidence that "establishes discriminatory intent without inference or presumption."  *See Earley*, 907 F.2d at 1081.  "Only the most blatant remarks whose intent could only be to discriminate . . . constitute direct evidence."  *Id.* (citations omitted).  Here, Plaintiff fails to carry this heavy burden.

To this end, a plaintiff alleging a violation of her rights under the ADA must show that she is (1) a qualified individual (2) with a disability and (3) that her employer discriminated against her because of that disability. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007). With respect to her accommodation and termination claims, the only real question here is whether Plaintiff can establish the third element — *i.e.*, that Defendant unlawfully discriminated against because of her disability. For the reasons outlined below, the court concludes that Plaintiff cannot establish the third element of a *prima facie* case with respect to either ADA claims.

### 1.    ADA Failure to Accommodate

The ADA imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A); *Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996). A plaintiff bears the burden of demonstrating that an accommodation is reasonable. *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998). Under the ADA, an employer discriminates against a qualified individual on the basis of disability by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability or terminating an individual because of her disability. *See* 42 U.S.C. § 12112(b)(5)(A), (B); 29 C.F.R. § 1630.9(a), (b).

---

Defendant's letter to the EEOC recounting Hardy's experience with Plaintiff does not amount to direct evidence because it neither implies nor suggests that Defendant would not accommodate Plaintiff's requests *because* of Plaintiff's disability. (Pl. Ex. F-6, Bellsouth Letter, May 22, 2012, at 1). At most, Hardy's letter suggests that Defendant waited to accommodate Plaintiff until her doctor confirmed her requests. Similarly, Hardy's "documented harassment" is at best circumstantial evidence of discrimination. Plaintiff claims that on November 15, 2011, "Plaintiff's supervisor called in to inquire about Plaintiff's modified tour and advised the Disability Center to remove Plaintiff from modified tour and the call center removed Plaintiff against doctor's orders." (Doc. 22 at 9-10 (citing Pl. Ex. D-4, STD Admin. Record, at 899-900)). The entries to the November 15 Administrative Record are ambiguous; however, on a motion for summary judgment the court resolves any ambiguity in favor of the nonmovant. Accordingly, the record may support Plaintiff's claim that Hardy requested that Plaintiff be removed from leave. But, the court only reaches this conclusion indirectly by inference. Standing alone, the transcript in no way directly demonstrates that Hardy or any of Defendant's other employees took any action with discriminatory intent. Therefore, the Rule 56 record contains only circumstantial evidence of discrimination.

Specifically, Plaintiff's allegations center on two requests for accommodation that Defendant denied: (1) Plaintiff's request for a transfer due to a loud work environment, and (2) Plaintiff's request for additional reduced work hours under Short Term Disability.[12]  Defendant counters that it reasonably accommodated each of these two requests made by Plaintiff.  For the reasons stated below, the court agrees and therefore concludes that Defendant is entitled to summary judgment as to each of Plaintiff's accommodation claims.

### a.  The Loud Music

Defendant reasonably accommodated Plaintiff regarding her concerns with the loud music at her call center.  Plaintiff alleges that, although she never made a formal request or complaint with Defendant, she asked her supervisor if she could be transferred to another call center due to the loud environment where she was working.  The record shows that Defendant accommodated Plaintiff by turning down the music at the call center in which she worked.  Plaintiff claims, in part, that this accommodation was insufficient because Defendant did not transfer her as she requested.  (Doc. 22 ¶ 14 (citing Pl. Dep. 164-165, 172-174)).  But, for the reasons noted below, that argument misses the mark.

An employer's duty to accommodate under the ADA is not absolute.  Indeed, "an employer is not required to accommodate an employee in any manner in which that employee desires . . . [T]he word 'reasonable' would be rendered superfluous [if under] the ADA [] employers were required to provide employees 'the maximum accommodation or every conceivable accommodation possible. . . . [a disabled employee] is not entitled to the accommodation of her choice." *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1285-86 (11th Cir. 1997); *see also Crumpton v. St. Vincent's Hosp.*, 963 F. Supp. 1104, 1114

---

[12] On another occasion, in January 2011, Plaintiff broke her ankle and requested that Defendant provide her with a wheelchair, and Defendant complied.  (Pl. Dep. 156:21-157:4).  It is undisputed that Defendant reasonably accommodated this request.

(N.D. Ala. 1997) (granting summary judgment and holding that "the employer does not have to provide plaintiff with the accommodations that Plaintiff requested or prefers" and that the "accommodation does not have to be the 'best' accommodation possible, as long as it is sufficient"). Thus, a plaintiff is not entitled to the accommodation of her choice, but only to a reasonable accommodation.

Defendant reasonably accommodated Plaintiff by lowering the volume of the music it played in its call center. Plaintiff's sole reason for her requested transfer was that she believed the call center's loud environment, created in part by the loud music, was distracting. (Pl. Dep. 157:15-158:7). Defendant turned down its call center music for Plaintiff to avoid having to relocate her. (*Id.* at 164:7-20). In this circumstance, there was a reasonable accommodation which did not require Plaintiff's transfer to another area.[13] And, to be sure, Plaintiff does not argue that, after Defendant's accommodation, the volume in her call center was still too loud to cause her any further annoyance or distraction. (*Id.*). In fact, nothing in the record suggests that this alternative accommodation was otherwise insufficient. Finally, and perhaps most

---

[13] Moreover, the court notes that in different contexts, "[s]everal courts have held that transferring disabled individuals solely to allow the employee to work in a different setting or under a different supervisor is not an accommodation reasonably to be expected." *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995); *see also Mazzarella v. USPS*, 849 F. Supp. 89, 95 (D. Mass. 1994); *Mancini v. General Elec. Co.*, 820 F. Supp. 141, 148 (D. Vt. 1993). Furthermore, if the ADA required employers to transfer employees as a "reasonable" accommodation, it would undermine employers' ability to control their labor force. *See Lewis*, 908 F. Supp. at 948. Such a holding would give disabled employees preferential treatment over nondisabled persons, with regard to access to transfers. This is the problem that Defendant faced in this case, as Hardy stated in Defendant's letter to the EEOC:

> [Plaintiff] also requested to be transferred to a different sales center located in Birmingham. I explained that we must comply with our working agreement when transferring/filing vacancies. At this time, we were not hiring. By us not hiring we are unable to transfer between departments. I advised that once we were hiring she could make a request.

(Pl. Ex. F-6, Bellsouth Letter, May 22, 2012). The ADA does not require Defendant to favor Plaintiff over its other employees, and Defendant is required only to provide such reasonable accommodations as are possible under the circumstances.

importantly, Plaintiff admits that Defendant's alternative accommodation was sufficient to alleviate her discomfort. (*See* Pl. Dep. 164:7-20).

Plaintiff has failed to sustain her ADA claim for Defendant's failure to accommodate her transfer request. Accordingly, the court concludes Defendant's action was sufficient to reasonably accommodate Plaintiff and Defendant was not obligated to transfer her.

### b. The Request for a Modified Schedule

Neither can Plaintiff sustain a claim that Defendant failed to accommodate her disability by refusing her request for a modified work schedule. The court understands Plaintiff to assert two arguments regarding Defendant's refusal to modify her work schedule: Plaintiff contends that (1) Defendant unreasonably delayed accommodating Plaintiff's request for a modified work schedule; and (2) after granting Plaintiff an accommodation for a modified work schedule, Hardy unlawfully discriminated against Plaintiff by having that accommodation voided between November 15, 2011, and November 18, 2011.

The parties disagree about what occurred in relation to Plaintiff's request for a modified work schedule, but this disagreement is not based upon a genuine dispute as to the material facts. Defendant contends that it granted Plaintiff's request for a modified work schedule and permitted Plaintiff to work from September through November without performance objectives. Although Plaintiff does not dispute that Defendant "eventually" accommodated her by permitting her to work half days, Plaintiff claims that Defendant initially denied her claims for modified work schedule. (Pl. Dep. 150:4-25). Plaintiff contends that Defendant's delay in granting her request, and the subsequent break in her accommodation, make the accommodation unreasonable.

Several courts have indicated that an unreasonable delay may amount to a failure to provide reasonable accommodation. *See, e.g., Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d

190, 200-01 (1st Cir. 2011); *Kintz v. United Parcel Serv., Inc.*, 766 F. Supp. 2d 1245, 1256-57 (M.D. Ala. 2011); *Terrell v. USAir, Inc.*, 955 F. Supp. 1448, 1454 (M.D. Fla. 1996)*, aff'd,* 132 F.3d 621 (11th Cir. 1998); *Hartsfield v. Miami–Dade Cnty.*, 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000); *Ungerleider v. Fleet Mortg. Grp. of Fleet Bank*, 329 F. Supp. 2d 343, 355 (D. Conn. 2004).   However, even when there is some delay, a short one may still permit a conclusion that a defendant's accommodation was reasonable.   *See, e.g.*, *Kintz*, 766 F. Supp. 2d at 1256-57 (15-day delay reasonable); *Terrell*, 955 F. Supp. at 1454 (3-month delay reasonable); *Hartsfield*, 90 F. Supp. 2d at 1373 (several month delay reasonable).

Courts in this circuit have sanctioned delays as long as several months as a matter of law. *See Terrell*, 955 F. Supp. at 1454 (3-month delay reasonable); *Hartsfield*, 90 F. Supp. 2d at 1373 (several month delay reasonable).   For example, in *Terrell*, an employee with carpal tunnel syndrome sued her employer claiming violations of the ADA for a thirteen-month delay in the receipt of a drop keyboard after it was requested as an accommodation.   The Eleventh Circuit affirmed summary judgment for the employer.   Similar to the situation here, the employee in *Terrell* had been on leave for a significant portion of that thirteen-month period of delay.   *See* 955 F. Supp. at 1454 (finding employee was on leave for ten of the thirteen months).   During the three months that the employee in *Terrell* was not on leave, she was either provided "some access" to a drop keyboard or simply did not have to type.   *Id.*   The *Terrell* court concluded this accommodation was reasonable as a matter of law.   *Id.*

In this case, a review of the undisputed Rule 56 evidence demonstrates that Plaintiff has grossly exaggerated Defendant's delay in providing accommodation.   In fact, Plaintiff was actually on leave for nearly the entire time she claims Defendant failed to grant her

accommodations.   Any short delay Plaintiff may have suffered simply does not render Defendant's eventual accommodation of her.

It is undisputed that Plaintiff was granted reduced work hours from November 11 to November 14, and again from November 21 to December 5.  Neither Plaintiff nor her doctors argue that Plaintiff was entitled to any accommodation beyond December 5.  (*See* Pl. Ex. F-6, Tieszen Recommendation, Nov. 30, 2011).  Nevertheless, Plaintiff asserts that she requested a modified work schedule upon her return to work in September, even though that request was not granted until November.  (*See* Doc. 22 at 2-3; *see also* Pl. Dep. 150:4-25).

The key point here, however, is that after Plaintiff returned to work from leave on September 2, she worked for, at most, a week-and-a-half before she relapsed on September 14. (Doc. 22 at 2; *see* Pl. Dep. 150:4-25, 170:1-14; Pl. Ex. D-4, STD Admin. Record, at 875-83). From September 14 to November 6, Plaintiff remained away from work on STD benefits.  (*See* Pl. Ex. D-4, STD Admin. Record, at 892).  Although Plaintiff returned to work on or around November 7, the exact schedule Plaintiff worked is unclear.  (*Id.* at 893).  The Disability Center transcripts indicate she was granted six-hour days until November 11.  (*Id.* at 898 (noting six-hour limit starting November 7)).  But Plaintiff informed the Disability Center that she worked two eight-hour days on Monday, November 7 and Tuesday, November 8.  (*See id.* at 897).  (*But see id.* at 898) (Plaintiff reporting she only worked six-hour days from November 7 to November 11).

What is clear, however, is that between November 7 and November 11, Defendant and Plaintiff were continuing to exchange information about Plaintiff's medical condition as Defendant evaluated the need for a more permanent accommodation.  (*See id.* at 896-898).  On November 11, Plaintiff was formally granted a reduction in hours, and she remained on this

modified tour until November 14.  (*See* Ex. 21 to Pl. Dep., Restricted Duty Notice).  Therefore, the record shows that the only time between September 2 and November 15 that Plaintiff would have been without an accommodation would have been the one-and-a-half weeks between September 2 and September 14 and, possibly, the week of November 7.

Therefore, Plaintiff was on leave for seven-and-a-half weeks of the nine- to ten-week period in which she claims there was a delay in accommodation.  And, just as in *Terrell*, Plaintiff was granted modified duties pending her receipt of her requested accommodation.  *See* 955 F. Supp. at 1454.  Here, Plaintiff was not required to meet any performance objective while her accommodation was pending.  Accordingly, the court readily concludes that a two-and-a-half week delay in Plaintiff's receipt of a modified work schedule does not make Defendant's "eventual" accommodation of her unreasonable.

Finally, Plaintiff makes much of the fact that Hardy caused Sedgwick to void Plaintiff's modified schedule leaving her without an accommodation between November 15 and November 18.  (*See* Doc. 22 at 2-3, 5-6, 9, 12-14).  Defendant disputes this allegation, contending that "nothing on the pages cited by Plaintiff shows Hardy caused Sedgwick to deny Plaintiff's claim for continued STD benefits."  (Doc. 24 at 5).

Of course, on a motion for summary judgment the court must resolve all reasonable doubts about the facts and draw all justifiable inferences in favor of the non-movant.  *See Fitzpatrick*, 2 F.3d at 1115.  Plaintiff identifies Disability Center transcripts showing Hardy called Plaintiff's claim manager inquiring about the status of Plaintiff's leave request, and immediately thereafter, Plaintiff received a voicemail voiding her modified tour.  (*See* Pl. Ex. D-4, STD Admin. Record, at 899).[14]

---

[14] Three days later, on Friday, November 18, Plaintiff provided Defendant a new doctor's recommendation that she be granted a modified work schedule for the next two weeks.  (Pl. Ex. F-6, Tieszen Recommendation, Nov.

In a response letter to the EEOC, Defendant points to facts that are undisputed and which provide context to an otherwise ambiguous Administrative Record.  (Pl. Ex. MISC-9, Def. Resp. Letter to EEOC, Feb. 29, 2012).  In the letter, Defendant defends removing Plaintiff from a modified work schedule, arguing that upon returning to work on November 7, Plaintiff's request for a modified work schedule was not supported by any documentation.  (*Id.*).  As Defendant has noted, "[Plaintiff's] request could not be accommodated until additional information could be obtained from Respondent's Integrated Disability Center who processes all requests for workplace restrictions."  (*Id.*).  Once Plaintiff and her doctors provided Defendant with the required documentation, her requests were promptly honored.  (*Id.*).  Other Rule 56 evidence supports (and no evidence has been offered to contradict) this conclusion.  For example, Plaintiff offers evidence showing that less than three days after Hardy called Plaintiff's claim manager, Dr. Tieszen provided Defendant with a recommendation that Plaintiff work "half days for two weeks."  (Pl. Ex. F-6, Tieszen Recommendation, Nov. 18, 2011).  Plaintiff was immediately granted restricted work hours from Monday, November 21 to December 4.  (Ex. 20 to Pl. Dep., Restricted Duty Notice).  And, after November 21, it is undisputed that Plaintiff was not disciplined or penalized for working a modified work schedule.  (Pl. Dep. 150:4-154:23).

Plaintiff has failed to point to any evidence contradicting Defendant's claim that the three-day delay in continuing accommodation was due to Plaintiff's failure to provide updated medical documentation.  Therefore, Plaintiff has failed to point to a genuine issue of material fact as to her claim that Defendant, through Hardy, intentionally and unlawfully discriminated against Plaintiff by voiding her accommodation between November 15 and November 18.

---

18, 2011).  Plaintiff remained on a modified schedule as she requested until December 5, 2011.  (Ex. 20 to Pl. Dep., Restricted Duty Notice).

Accordingly, and for all the reasons stated above, Defendant is entitled to summary judgment on Plaintiff's ADA accommodation claims.

### 2.    Plaintiff's ADA Discriminatory Termination Claim

After careful review, the court concludes that Plaintiff cannot sustain a claim for discriminatory termination under the ADA.  Count One of Plaintiff's Complaint alleges, in part, that Defendant "terminated Plaintiff because of her disability or because it regarded her as being disabled or due to a record of impairment/disability."  (Doc. 1, Compl. ¶ 23).  To establish a *prima facie* case of discrimination, a plaintiff must show that (1) she is disabled, (2) she is a qualified individual, and (3) her employer discriminated against her because of her disability.  *See Greenberg*, 498 F.3d at 1263 (citing 42 USC 12112(a)).  If a plaintiff can establish a *prima facie* case of discrimination, the employer must produce a legitimate, nondiscriminatory reason for its action.  If Plaintiff satisfies all of the elements of a *prima facie* case of discrimination, the burden then shifts to the Defendant, who is required to "articulate a legitimate, nondiscriminatory reason for [their] employment actions[s]." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003).

The undisputed Rule 56 record makes clear that Plaintiff cannot prevail on her disability termination claim for at least two reasons.  First, she cannot show she was involuntarily terminated.  And second, she cannot establish that she was the victim of disability discrimination.  The court addresses these two reasons, in turn.

In this case, the undisputed Rule 56 evidence indicates that Plaintiff resigned her position.  It is well-established that a plaintiff who voluntarily resigns cannot sustain a claim for wrongful termination under the ADA.  But the mere fact that Plaintiff resigned does not end the inquiry because, as a general rule, this legal principle does not apply in the event a resignation is

coerced.  Employee resignations are presumed to be voluntary, but as the Eleventh Circuit has recognized, if an employer forces an employee's resignation by coercion or duress, that resignation will be deemed involuntary.  *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (citations omitted); *see also MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1299 (M.D. Fla. 2002).  In determining whether coercion or duress played a role in an employee's resignation, the court must look at the totality of the circumstances to decide whether "the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign."  *Hargray*, 57 F.3d at 1568.  The Eleventh Circuit has indicated that certain factors may be helpful in determining whether the resignation was obtained by coercion or duress, including: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice she was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.  *Id.*  Plaintiff's argument primarily rests on the first factor.[15]  The Eleventh Circuit's guidance on this issue is particularly instructive:

> [T]he mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary . . . .  [R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. *Pitt v. United States*, 420 F.2d 1028 (Cl. Ct. 1970). Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff had a choice. [Plaintiff] could stand pat and fight.' *Christie v. United States*, 518 F.2d 584, 587 (Cl. Ct. 1975).

---

[15] No evidence suggests, and Plaintiff does not argue, that Plaintiff did not understand the nature of her choice to resign, that the time she was given to decide was unreasonable, or that her choice would have been different with the advice of counsel.  Furthermore, Plaintiff effectively selected the date of her resignation, rather than wait until after the March 2012 performance results were published.

*Id.*  This instruction, although not wholly dispositive of the matter here, guides the court's determination that Plaintiff's resignation was voluntary.

Plaintiff was given at least two alternatives and allowed to make a choice between them: she could either resign and thereby qualify for severance pay; or she could wait for her March performance results to be revealed and face termination *if* her performance was deficient.  (Pl. Dep. 93:1-94:25, 105:9-106:6, 109:15-118:14).  Ultimately, Plaintiff chose to resign and collect termination pay rather than take her chances with the prospect of having disappointing performance results.  (*Id.* at 81:9-24, 112:14-24; Ex. 15 to Pl. Dep.).  Clearly here, Plaintiff chose not to stand and fight the looming threat of her termination.  It makes no difference that her choice was between the lesser of two unpleasant outcomes.

Plaintiff argues that because *Defendant* had "other alternatives," her resignation was "forced."  (Doc. 22 at 15).  But that argument cuts no ice at all because it is based on a misunderstanding of the standard for involuntary termination.  The voluntariness of an employee's resignation turns on "whether the *employee* was given some alternative to resignation" *Hargray*, 57 F.3d at 1568 (emphasis added) — not the availability of alternatives to Defendant.  Therefore, because Plaintiff herself had a fair opportunity to select an alternative to resignation, the court concludes that Plaintiff's resignation was voluntary.  And, because Plaintiff voluntarily resigned, Defendant did not involuntarily terminate Plaintiff.

But even if Plaintiff was involuntarily terminated by Defendant (and to be clear she was not), she still cannot survive summary judgment here for an alternative reason — she has failed to offer any evidence from which a reasonable trier of fact could infer that Defendant terminated her on account of her disability.  That is, Defendant has offered several legitimate, nondiscriminatory reasons for Plaintiff's termination, and Plaintiff has not offered any evidence

of pretext — that is, she has not contradicted Defendant's reasons.  Plaintiff had reached the unenviable third step of discipline for unsatisfactory sales performance.  (Pl. Dep. 87, 92-93). At the time of her resignation, Plaintiff was unable to meet her sales objective for the month of March, thereby triggering her termination under the CBA.  (*Id.* at 62, 85-88, 91-94, 105-06, 109-18).  Defendant gave Plaintiff the opportunity to resign before her official sales numbers were reported so that Plaintiff could accept severance in lieu of termination and, indeed, she accepted that offer.  (*Id.* at 81, 112, Ex. 15 to Pl. Dep.).  Accordingly, Plaintiff cannot sustain a claim for wrongful termination under the ADA, and Defendant is entitled to summary judgment on that claim.

### B.      Plaintiff's ADA Retaliation Claims

Liberally read, Count Two of Plaintiff's Complaint alleges retaliation, an unlawful employment practice under the ADA.  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (quoting 42 U.S.C. § 12203(a)).  To the extent Plaintiff is actually pursuing a retaliation claim under the ADA, it is clearly based on circumstantial evidence.  Such a claim is analyzed under the familiar framework employed for retaliation claims under Title VII. *Stewart*, 117 F.3d at 1287 (citing *McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1075-77 (11th Cir. 1996)).

In order to establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression.  *See id.* at 1260-61; *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).  Once a *prima facie* case is established, the employer has the burden to articulate a legitimate, nonretaliatory

reason for the employment decision. *Id.* This burden involves no credibility determination, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). So long as the employer articulates "a clear and reasonably specific" nonretaliatory basis for its actions, it has discharged its burden of production. *Texas Dep't of Comm'ty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). After an employer articulates one or more legitimate, nonretaliatory reasons for the employment action, the plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason, but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

For the reasons stated below, the court concludes the Rule 56 record demonstrates Plaintiff's inability to establish a *prima facie* case, and that Defendant has articulated a legitimate, nonretaliatory reason for its employment action. Therefore, because Plaintiff cannot show that Defendant's proffered reason is pretextual, Plaintiff's retaliation claims must fail.[16]

### 1.    Plaintiff's *Prima Facie* Case

Plaintiff has failed to establish a *prima facie* case because she has not articulated an adverse employment action. As a threshold matter, the court notes that Plaintiff has not articulated any adverse employment action Defendant purportedly took against her.[17] Plaintiff

---

[16] Plaintiff does not address any of the three elements of an ADA retaliation claim. However, the court concludes that Plaintiff engaged in statutorily protected activity as early as November 22, 2011, when she filed an EEOC intake questionnaire. (Pl. Ex. E-5, EEOC Intake Questionnaire, at 1381; *see also* Doc. 22 at ¶¶ 8-9). Plaintiff continued to engage in protected activity leading up to her termination in March 2012 by participating in the EEOC's subsequent investigation of her claim.

[17] Plaintiff alleges only that:

Although, AT& T's Integrated Disability Service Center was fully aware that mental illness is a disability as evidence by its letter to the Plaintiff dated September 14, 2011. (See Exhibit G) at p. BST 000906) she still received discrimination by her Supervisor Anastasia "Stacy" Hardy when Hardy placed a call to Plaintiff's disability case manager to disallow her accommodations. (See Exhibit D) at p. BST 00899).

suggests only that after Defendant placed Plaintiff on restricted hours on November 21, 2011, "Supervisor Hardy began her retaliation of Plaintiff."  (Doc. 22 at 6, 17).  Defendant counters that Plaintiff suffered no adverse job action because Plaintiff voluntarily resigned and was neither terminated nor constructively discharged.  (Doc. 20 at 22).  In response -- at least as the court understands her response -- Plaintiff argues simply that Defendant retaliated against her by coercing her resignation.  (Doc. 22 at 15-16 (suggesting the ADA protects against wrongful termination disguised as voluntary resignation, and Plaintiff's resignation was unlawful because "there were other alternatives versus *forced resignation*")).  For the reasons outlined above with respect to Plaintiff's ADA wrongful termination claim, however, the court has concluded that Plaintiff's resignation was voluntary.

Therefore, because the court concludes that Plaintiff's resignation was voluntary, the resignation cannot constitute an adverse employment action, and Plaintiff's failure to establish a *prima facie* case of retaliation entitles Defendant to summary judgment on Plaintiff's ADA retaliation claim.

### 2.    Defendant's Legitimate, Nonretaliatory Reason is Not Pretextual

Even assuming Plaintiff could make a prima facie case of retaliation, her claim would nevertheless fail.  Once a plaintiff makes a *prima facie* case of retaliation, the employer must produce evidence that it had a legitimate, nonretaliatory reason for its actions.  *See Brooks v.*

---

(Doc. 22 at 16).  Plaintiff indicates that after Defendant received notice of Plaintiff's disability, Defendant placed Plaintiff on a modified tour "and Supervisor Hardy began her retaliation of Plaintiff."  (Doc. 6).

In support of her *retaliation* claim, Plaintiff argues that she was refused reasonable accommodation for her disability and cites only two sources.  (Doc. 6 (citing "Exhibit G) at BST 001063 & Exhibit G ('Plt Dep.') Exhibit 23")).  First, Plaintiff cites a transcript which seems to indicate that, on or around November 21, 2014, Hardy was "very upset with [Plaintiff] that she had [returned to work] on mod tour."  (Pl. Ex. G-7, STD Admin. Record, at 1063).  Second, Plaintiff cites generally to her deposition.  Without further argument or direction from Plaintiff on this issue, the court presumes that Plaintiff intends to overcome Defendant's Motion (Doc. 20) on this evidence alone.  This Plaintiff cannot do. However, neither of these sources provides any indication that Plaintiff is entitled to relief.  The record is undisputed that after November 21, 2011 (*i.e.*, the date after which Plaintiff claims she was retaliated against by Hardy), Plaintiff received every reasonable accommodation that she requested.

*Cnty. Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006).  The employer's burden of production is "exceedingly light" and involves no credibility determination.  *Perryman*, 698 F.2d at 1141.  So long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production.  *Burdine*, 450 U.S. at 254-55.  Here, Defendant easily carries this burden.

There is no disagreement that Plaintiff had reached the third step of Defendant's progressive discipline policy due to her unsatisfactory sales performance.  (Pl. Dep. 71:7-72:1).  Plaintiff failed to meet her sales objectives in December 2011, January 2012, and February 2012.  (*Id.* at 102:6-103:24, 105:9-20; Ex. 15 to Pl. Dep.).  Under the Labor Agreement's progressive discipline policy, the next step of discipline was termination.  (Pl. Dep. 87:14-25, 92:23-93:19).  It is undisputed that, as of March 28, 2012, the date of Plaintiff's resignation, Plaintiff would not have been able to meet her sales objective for March.  (*Id.* at 85:1-88:15, 91:19-94:25, 105:9-106:6, 109:15-118:14).  As such, at the end of March, Defendant would have been justified in terminating Plaintiff's employment.  (*Id.* at 62:4-18).  Instead, Defendant gave Plaintiff the opportunity to resign so that she would be eligible for severance pay, and Plaintiff voluntarily accepted Defendant's act of generosity.  (*Id.* at 81:9-24, 112:14-24, Ex. 15 to Pl. Dep.).

Therefore, because of Plaintiff's history of poor performance, the court concludes that Defendant has articulated a legitimate, nonretaliatory reason for seeking Plaintiff's resignation.  Accordingly, for this separate and additional reason, and because Plaintiff has made no effort to offer evidence of pretext, Defendant is entitled to summary judgment on each of Plaintiff's ADA retaliation claims.

### C.    FMLA Claims

Based on the Rule 56 record, the court also concludes Defendant is entitled to summary judgment on Plaintiff's FMLA claims because Plaintiff is not an "eligible employee" under the

relevant statutory scheme.   Plaintiff's Complaint asserts claims under the FMLA for both interference and retaliation.   (Doc. 1, Compl., at 6-8 (Counts Three and Four)).   Specifically, Plaintiff alleges that, on November 11, 2011, Defendant not only unlawfully interfered with her FMLA rights, but also retaliated against Plaintiff by denying her access to fifteen hours of FMLA leave.   Before addressing the substance of Plaintiff's FMLA claims, however, the court must decide the threshold issue of whether Plaintiff was an "eligible employee."

Under the FMLA, "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period" for any one of several reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee."   29 U.S.C. § 2612(a)(1)(D).   To qualify as an "eligible employee," a plaintiff must have worked for the employer for at least twelve months and 1,250 hours during the previous twelve-month period. *Id.* at § 2611(2)(A).   The regulations promulgated under the FMLA clarify that an employee must have been employed "for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave."   29 C.F.R. § 825.110(a)(2).   As such, a determination as to FMLA eligibility is to be made as of the date the requested FMLA leave is to start.   *Pereda v. Brookdale Senior Living Comm., Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012).

Because the court finds that the Rule 56 record reflects that, at the relevant times, Plaintiff was not an "eligible employee" under the FMLA, Defendant is entitled to summary judgment on each of Plaintiff's claims.   Plaintiff has conceded that, as of November 11, 2011, she failed to work the requisite number of hours required to be entitled for FMLA leave.   As of November 11, the date Plaintiff sought FMLA leave, Plaintiff had worked only 728.87 hours in the preceding twelve months.   (Pl. Dep. 129:4-14; Ex. 17 to Pl. Dep. at 2).   Plaintiff's response to

this is unavailing:  she claims that after having qualified to take FMLA leave, she is not required to re-establish her FMLA eligibility, in terms of the number of hours worked, in order to take additional leave for the same qualifying event during the same calendar year.  (*See* Pl. Dep. 145:9-24; Doc. 22 at 7).[18]   Therefore, Plaintiff argues, because she was eligible to take FMLA leave in March and September of 2011, she remained eligible to take leave on November 11, 2011, for the same qualifying condition.  Plaintiff identifies no legal basis for this contention.[19]

In *Rich v. Delta Air Lines, Inc.*, a plaintiff brought an FMLA claim against her employer, claiming eligibility based on the employer's internal policy of providing certain leave benefits to flight attendants and others who work at least 540 hours instead of the statutory standard that requires employees work 1,250 hours.  921 F. Supp. 767, 773 (N.D. Ga. 1996).  In that case, the plaintiff claimed that she had been denied leave in violation of the FMLA because she had satisfied the employer's 540-hour standard, even though she failed to meet the 1,250-hour statutory standard.  *Id.*   Judge Vines held that the FMLA does not create a federal cause of action for enforcing voluntary employer policies of providing greater family or medical leave rights to

---

[18] The court assumes without deciding that the evidence reflects Plaintiff had fifteen hours of FMLA leave remaining for the calendar year on September 14, 2011 and November 11, 2011.  (*See* Pl. Ex. H, FMLA Eligibility Form, Sept. 14, 2011, at 1467-68).

[19] In addition to her other assertions, Plaintiff seems to suggest that Defendant's internal leave policy validates her argument that Plaintiff need not attain 1,250 hours in the preceding twelve months to qualify for FMLA leave.  As part of her contention, Plaintiff points to language in Defendant's FMLA Eligibility Forms, which reads in relevant part:

> Once the employee meets these two eligibility criteria (referring to the 12 months of work criteria and the 1,250 hours criteria) and takes leave for a qualifying event, and get FMLA Approved, the employee does not have to re-qualify, in terms of the number of hours worked, in order to take an additional leave for the same qualifying event during the same calendar year.

(Doc. 22 at 7-8 (quoting Pl. Ex. H, FMLA Eligibility Forms)).  Plaintiff argues, based on this form's language, that having found Plaintiff eligible for FMLA leave on September 14, 2011, Defendant could not look at whether she "requalified" for FMLA leave.  For the purposes of this Motion (Doc. 20), the court accepts Plaintiff's otherwise unsupported conclusion that Defendant's Eligibility Form embodies a more lenient leave policy than that mandated by the FMLA.  Regardless, such a more favorable leave policy (as evidenced in the FMLA Eligibility Forms) is irrelevant in determining whether Plaintiff is an "eligible employee" under the FMLA and as a matter of *federal law*.

employees than those rights established by statute.  *Id.*  As the *Rich* court noted, "the FMLA expressly and unequivocally provides that for an employee to be eligible for protection under the Act, she must have worked 1,250 hours for her employer in the previous twelve-month period. The plaintiff cannot use the defendant's internal policy to amend the explicit coverage provision adopted by Congress."  *Id.*

This court finds Judge Vining's reasoning persuasive.  An internal leave policy, no matter how liberal, does not operate to heighten the statutory eligibility standards of the FMLA.  As of November 11, 2011, the simple and undisputed fact was that Plaintiff failed to satisfy the statutory eligibility requirements for FMLA leave.  And, regardless of any of Defendant's extra-statutory policies, on November 11, 2011, Plaintiff was not an "eligible employee" under the FMLA because she failed to pass the 1,250-hour eligibility test.  Accordingly, Defendant is entitled to summary judgment on all of Plaintiff's FMLA claims.

## IV.   Conclusion

For the reasons outlined above, Defendant's Motion for Summary Judgment (Doc. 20) is due to be granted.  Plaintiff has failed to create any genuine issue of material fact as to any of her claims under the ADA and FMLA.  Accordingly, all of Plaintiff's claims are due to be dismissed with prejudice.

A separate order will be entered in accordance with this Memorandum Opinion.

**DONE** and **ORDERED** this February 4, 2015.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE